ORAL ARGUMENT NOT YET SCHEDULED
CASE NO. 16-1276

**IN THE UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT**

_____

MINTEQ INTERNATIONAL, INC., AND SPECIALTY MINERALS, INC.,
WHOLLY OWNED SUBSIDIARIES OF MINERALS TECHNOLOGIES, INC.

Petitioner/Cross-Respondent,

vs.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner.

_____

ON PETITION FOR REVIEW FROM ORDER OF THE
NATIONAL LABOR RELATIONS BOARD

_____

**FINAL BRIEF OF PETITIONER**

| | |
|---|---|
| Jonathan O. Levine | A. John Harper III |
| Adam P. Tuzzo | 1301 McKinney St., Suite 1900 |
| Littler Mendelson, P.C. | Houston, Texas 77010 |
| 111 East Kilbourn Avenue | Tel: (713)652-4750 |
| Suite 1000 | Fax: (713)513-5978 |
| Milwaukee, WI 53202 | ajharper@littler.com |
| Tel: (414) 291-5536 | |
| Fax: (414) 291-5526 | |
| jlevine@littler.com | Maurice Baskin |
| atuzzo@littler.com | 815 Connecticut Ave, N.W., Suite 400 |
| | Washington, D.C. 20006 |
| | Tel: (202)772-2526 |
| | Fax: (202)3184048 |
| *Counsel for Petitioner* | mbaskin@littler.com |

## CORPORATE DISCLOSURE STATEMENT PURSUANT TO CIRCUIT RULE 26.1

Pursuant to the Federal Rules of Appellate Procedure 26.1 and Circuit Rule 26.1, the undersigned counsel for Petitioner states that Minteq International, Inc. and Specialty Minerals Inc. are wholly owned subsidiaries of Mineral Technologies Inc. Mineral Technologies Inc. is a publicly held non-governmental corporate party, and does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

## CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES

### A.    Parties and *Amici*

1.    Minteq International, Inc. ("Minteq") and Specialty Minerals, Inc. ("SMI"), wholly owned subsidiaries of Minerals Technologies, Inc. ("MTI") (collectively the "Company"), together are the Petitioner.

2.    The National Labor Relations Board ("Board" or "NLRB") is the Respondent.

3.    The International Union of Operating Engineers, Local 150, AFL-CIO ("Union") is the Intervenor and was the charging party before Region 13 of the Board.

4.    There were no *amici* in the proceedings before the Board.

i

**B.      Ruling Under Review**

Petitioner seeks review of the Board's Decision and Order captioned as *Minteq International, Inc., and Specialty Minerals Inc., Wholly Owned Subsidiaries of Mineral Technologies, Inc. and International Union of Operating Engineers, Local 150*, AFL-CIO, Case 13-CA-139974 , 364 NLRB No. 63 (July 29, 2016).

**C.      Related Cases**

The instant case has not previously been before this Court or any other court involving the same parties.

Respectfully submitted,

*/s/ Jonathan O. Levine*
Jonathan O. Levine
Attorney for Petitioner

## STATEMENT REGARDING ORAL ARGUMENT

This case involves the Board's continued refusal to adhere to this Court's contract coverage standard when the parties have negotiated a collective bargaining agreement covering a particular bargaining subject. It also involves important questions regarding whether a company's effort to protect its confidential and proprietary information by requiring successful applicants to execute a non-competition agreement is a mandatory subject of bargaining. Oral argument will assist the Court in addressing these important issues.

TABLE OF CONTENTS

PAGE

I.    JURISDICTION ...................................................................................1

II.   ISSUES PRESENTED .........................................................................1

III.  RELEVANT STATUTES AND REGULATIONS .......................................2

IV.   STATEMENT OF THE CASE AND FACTS ...............................................3

      A.    A Core Aspect of the Company's Business Is the Development
            of Confidential and Proprietary Information.......................................3

      B.    The Company Took Reasonable Steps to Protect its
            Confidential and Proprietary Information...........................................6

      C.    Minteq's Burns Harbor Employees Are Covered by a
            Collective Bargaining Agreement.......................................................9

      D.    Magnesita's 2014 Push Into Burns Harbor. ....................................10

      E.    Minteq's Response to Magnesita's Poaching of its Employees .......12

      F.    Proceedings Below ............................................................................13

V.    SUMMARY OF THE ARGUMENT ..........................................................14

      A.    Minteq's Implementation of the NCCA Was Covered by the
            Parties' CBA....................................................................................14

      B.    The NCCA Was Not a Mandatory Subject of Bargaining In
            Any Event.........................................................................................15

      C.    The Board's Order Should Be Denied Enforcement to the
            Extent it Requires the Company to Bargain Over Rules that
            Comply with the Board's *Peerless Publications* Decision ...............17

      D.    The Board Erred in Finding that the NCCA's Interference with
            Relationships and At-Will Provisions Violated Section 8(a)(1)........17

VI.   STANDING .......................................................................................18

TABLE OF CONTENTS
(CONTINUED)

PAGE

VII.  ARGUMENT ..................................................................................18

A.  The NLRB Erred in Finding that the Company Violated Section 8(a)(5) Because Implementation of the NCCA Was Covered by the CBA ..................................................................................18

1.  The Management Rights Clause Covered Minteq's Implementation of the NCCA ...............................................20

a.  The NLRB Described the NCCA as a Work Rule, Policy or Practice ..........................................................20

b.  Other Provisions of the Management Rights Clause Support Minteq's Implementation of the NCCA ........................................................................22

2.  The Board Applied the Incorrect "Clear and Unmistakable Waiver" Standard in Finding a Bargaining Violation ................................................................................24

B.  Even if The NCCA Was Not Covered by the CBA, It Is Not a Mandatory Subject of Bargaining ........................................27

1.  The NCCA Is Excluded from Mandatory Bargaining Because It Lies at the Core of Entrepreneurial Control ..........29

a.  The Supreme Court Excludes Matters Lying at the Core of Entrepreneurial Control from Mandatory Bargaining ................................................................30

b.  This Court Has Applied *Fibreboard* to Unilateral Implementation of Rules ...............................................31

c.  Minteq's Confidential and Proprietary Information Lies at the Core of Entrepreneurial Control and Minteq Should Not Be Ordered to Bargain About Protecting Such Assets ...............................................32

T<small>ABLE OF</small> C<small>ONTENTS</small>
(C<small>ONTINUED</small>)

P<small>AGE</small>

        d.     The NCCA Is Not Amenable To Bargaining Because It Requires Minteq to Bargain Over Whether Employees Will Be Allowed to Engage In Unprotected Anticompetitive Conduct ....................33

    2.     The NCCA Does Not Sufficiently Impact Terms and Conditions of Employment........................................................35

        a.     The NCCA is a Hiring Practice .................................... 35

        b.     The NCCA Does Not Sufficiently Impact Terms and Conditions of Employment because it Regulates Unprotected Conduct ................................... 36

    3.     The Board's Holding that the NCCA Was a Mandatory Subject of Bargaining Is Not Supported by Substantial Evidence .................................................................................41

C.    Even If the Court Finds the NCCA Is a Mandatory Subject of Bargaining and Not Covered by the 2011 CBA, the Board's Order Is Overly Broad and Should Be Denied Enforcement............44

D.    The Board Erred in Finding that Certain Aspects of the NCCA Violate Section 8(a)(1) .......................................................................46

    1.     The "Interference with Relationships" Provision Does Not Violate Section 8(a)(1)....................................................48

    2.     The "At-Will Employment Rule" Does Not Violate Section 8(a)(1).......................................................................52

VIII. CONCLUSION ............................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

CASES[1]

*Abell Eng'g & Mfg.*,
   338 NLRB 434 (2002) ..........................................................33, 37, 51

*Adtranz ABB Daimler-Benz Tranp., N.A. v. NLRB*,
   253 F.3d 19 (D.C. Cir. 2001)....................................................38, 46

*Aerotek Inc.*,
   Case Nos. 17-CA-071193, 2013 NLRB LEXIS 151 (Mar. 11,
   2013) .........................................................................................37

*Aggregate Industries v. NLRB*,
   824 F.3d 1095 (D.C. Cir. 2016)................................................48, 52

*Albertson's, Inc. v. NLRB*,
   301 F.3d 441 (6th Cir. 2002) ........................................................21

*Allied Aviation Serv. Co.*,
   248 NLRB 229 (1980) ..................................................................52

*Allied Chem. & Alkali Workers of Am. Local Union No. 1 v.*
   *Pittsburgh Plate Glass Co*,
   404 U.S. 157 (1971)................................................................27, 28

*Altoona Hosp.*,
   270 NLRB 1179 (1984) .................................................................37

*Amtrack v. Veiolia Transp. Servs.*,
   791 F. Supp. 2d 33 (D.C. Cir. 2011)..............................................38

*Apple Mortg. Corp. v. Barenblatt*,
   162 F. Supp. 3d 270 (S.D.N.Y. 2016) ............................................38

*Aroostook County Reg. Opthalmology Ctr. v. NLRB*,
   81 F.3d 209 (D.C. Cir. 1996).........................................................50

---

[1] Authorities upon which we chiefly rely are marked with an asterisk

*Ashville School*,
  347 NLRB 877 (2006) ...................................................................37

*Associated Advertising Specialists, Inc.*,
  232 NLRB 50 (1977) .........................................................34, 37, 51

*BE&K*,
  351 NLRB 451 (2007) ...................................................................42

*BE&K Constr. Co. v. NLRB*,
  536 US 516 (2002) .........................................................................42

*Boise Cascade Corp. v. NLRB*,
  860 F.2d 471 (D.C. Cir. 1998) ......................................................41

*BP Amoco Corp. v. NLRB*,
  217 F.3d 869 (D.C. Cir. 2000) .................................................19, 20

*Brewers and Maltsters, Local Union No. 6 v. NLRB*,
  414 F.3d 36 (D.C. Cir. 2005) ........................................................27

*Carpenter v. United States*,
  484 U.S. 19 (1987) ........................................................................23

*Carry Cos. v. NLRB*,
  30 F.3d 922 (7th Cir. 1994) ..........................................................44

*Charles Schwab Corporation*,
  Case No. 28-CA-084931, 2012 NLRB GCM 34 (Sept. 14, 2012)..............47, 50

*\*Chicago Tribune Co. v. NLRB*,
  974 F.2d 933 (7th Cir. 1992) ...............................................22, 25, 26

*Conrail v. Surface Transp. Bd.*,
  93 F.3d 793 (D.C. Cir. 1996)..........................................................43

*\*Crystal Linen & Uniform Serv., Inc.*,
  274 NLRB 946 (1985) .................................................34, 37, 43, 51

*Davis v. Eagle Products, Inc.*,
  501 N.E.2d 1099 (Ind. Ct. App. 1986) ..........................................38

*Department of the Navy v. FLRA,
  962 F.2d 48 (D.C. Cir. 1992)....................................................................20, 26

Eastex, Inc.
  v. NLRB, 437 556, 565-66 (1978)........................................................52

Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. Trades
  Council,
  485 U.S. 568 (1988)....................................................................52

Empower Energies, Inc. v. Solarblue, LLC,
  16cv3220(DLC), 2016 U.S. Dist. LEXIS 130583 (S.D.N.Y. Sept.
  23, 2016) ........................................................................23

*Enloe Med. Ctr. v. NLRB,
  433 F.3d 834 (D.C. Cir. 2005)...........................................19, 20, 25

*Fibreboard Paper Prods. Corp. v. NLRB,
  379 U.S. 203 (1964)..............................................................30, 40

*First National Maintenance Corp. v. NLRB,
  452 U.S. 666 (1981)..............................................................30, 31

Ford Motor Co. v. NLRB,
  441 U.S. 488 (1979)...................................................................28

Fresh & Easy Neighborhood Market,
  Case 21-CA-085615, 2013 NLRB GCM LEXIS 7 (Feb. 4, 2013) ...................54

Frontier Tel. of Rochester,
  344 NLRB 1270 (2005) .............................................................37

Guardsmark, LLC v. NLRB,
  475 F.3d 369 (2007)..................................................................46

Harrah's Lake Tahoe Resort,
  307 NLRB 182 (1992) ..............................................................39

Heartland Plymouth Court MI, LLC v. NLRB,
  --F.3d--, 2016 U.S. App. LEXIS 17688 (D.C. Cir. 2016)................................25

Hertz Corp. v. NLRB,
  105 F.3d 868 (3d Cir. 1997) .........................................................35

ix

*I.R.S. v. Fed. Lab. Rel. Auth.*,
   963 F.2d 429 (D.C. Cir. 1992)........................................................35

*Kenai Helicopters*,
   235 NLRB 931 (1978) ........................................................34, 37, 51

*King Electric, Inc. v. NLRB*,
   440 F. 3d 471 (D.C. Cir. 2006).....................................................43

*King Soopers, Inc.*,
   340 NLRB 628 (2003) ....................................................................45

*Kopka, Landau, & Pinkus v. Hansen*
   874 N.E. 2d 1065 (Ind. Ct. App. 2007) ........................................38

*Lafayette Park Hotel*,
   326 NLRB 824 (1998) ....................................................................46

*Lionbridge Technologies*,
   Case No. 19-CA-115285, 2014 NLRB GCM LEXIS 11 (Mar. 31,
   2014) ..............................................................................................54

*Local Union No. 47, IBEW v. NLRB*,
   927 F.2d 635 (D.C. Cir. 1991)........................................................19

*\*Lutheran Heritage Village-Livonia*,
   343 NLRB 646 (2004) ....................................................17, 47, 49, 52

*Medeco Security Locks v. NLRB*,
   142 F.3d 733 (4th Cir. 1998) .........................................................44

*Mental Health Servs., N.W.*,
   300 NLRB 926 (1990) ...........................................................28, 34, 39

*National Assoc. of Gov't Employees, Local 500*,
   327 NLRB 676 (1999) ....................................................................27

*New York New York, LLC v. NLRB*,
   313 F.3d 585 (D.C. Cir. 2001)........................................................29

*\*Newspaper Guild of Greater Philadelphia, Local 10 v. NLRB*,
   636 F.2d 550 (.C. Cir. 1980)........................ 15, 30, 31, 32, 33, 34, 44

*NLRB v. Knuth Bros, Inc.*,
537 F.2d 950 (7th Cir. 1976) ............................................................37

*NLRB v. Metropolitan Life Ins. Co.*,
380 U.S. 438 (1965)..........................................................................21

*\*NLRB v. U.S. Postal Serv.*,
8 F.3d 832 (D.C. Cir. 1993)..................................... 18, 19, 20, 22, 24, 25, 26, 27

*Northern Elec. Co., Inc. v. Torma*,
819 N.E.2d 417 (Ind. Ct. App. 2004) ...........................................23, 43

*Oklahoma Gas & Elec. Co. v. FERC*,
827 F.3d 75 (D.C. Cir. 2016)............................................................29

*Pall Corp. v. NLRB*,
275 F.3d 116 (D.C. Cir. 2002)......................................................27, 28

*\*Peerless Publications*,
283 NLRB 334 (1987) ................................................................17, 44, 45

*Pieper Electric, Inc.*,
339 NLRB 1232 (2003) .....................................................................41

*Polar Water Co.*,
Case No. 06-CA-23917, 1992 NLRB GCM LEXIS 81 (Jan. 24,
1992) ........................................................................................34, 40

*Polar Water Co.*,
Case No. 6-CA-24823, 1992 NLRB GCM LEXIS 65 (Nov. 6,
1992) ................................................................................................36

*Potts v. Review Bd. of the Ind. Emp. Sec. Div.*,
475 N.E. 2d 708 (Ind. Ct. App 1985) ...............................................38

*Retail Clerks Local 1059 v. NLRB*,
348 F. 2d 369 (D.C. Cir. 1965).........................................................18

*Richboro Cmty. Mental Health Council*,
242 NLRB 1267 (1979) ....................................................................52

*Rocha Transportation*,
Case 32-CA-086799, 2012 NLRB GCM LEXIS 39 (Oct. 31, 2012) ...............54

*Star Tribune*,
   295 NLRB 543 (1989) ...................................................................36

*SWH Corporation d/b/a Mimi's Cafe*,
   Case 28-CA-084365, 2012 NLRB GCM LEXIS 20 (Oct. 31, 2012) ...............54

*Tradesmen International*,
   338 NLRB 460 (2002) ..............................................................47, 50

*Unger v. FFW Corp.*,
   771 N.E.2d 1240 (Ind. Ct. App. 2002) .......................................23, 43

*United States Postal Service*,
   308 NLRB 1305 (1992) ...............................................................35

*Windsor Care Centers*,
   Cases 32-CA-087540, 2013 NLRB GCM LEXIS 5 (Feb. 4, 2013).................54

*World Color (U.S.A.) Corp. v. NLRB*,
   776 F.3d 17 (D.C. Cir. 2015).....................................................46, 49

## STATUTES

29 U.S.C. § 157................................................ 2, 18, 46, 47, 49, 50, 51, 52, 54, 55

29 U.S.C. § 158(a) ......................................... 1, 2, 13, 17, 18, 27, 34, 36, 46, 48, 52

29 U.S.C. § 158(d) .............................................................................28

29 U.S.C. § 159(a) ..............................................................................2

29 U.S.C. § 160..............................................................................1, 2

29 U.S.C. § 160(f) ...........................................................................18

## OTHER AUTHORITIES

U.S. Const. Amend. I ...........................................................................42

**GLOSSARY**

ACM: ArcelorMittal
ALJ: Administrative Law Judge
BOF: Basic Oxygen Furnace
CBA: Collective Bargaining Agreement
J.A.:   Joint Appendix
MTI:  Mineral Technologies, Inc.
NCCA: Non-Compete and Confidentiality Agreement
NLRA or Act: National Labor Relations Act
NLRB or Board: National Labor Relations Board
SMI:  Specialty Minerals, Inc.
2011 CBA:  The January 1, 2011 – December 31, 2014 collective bargaining
agreement

# I.
## JURISDICTION

This is a petition for review from a decision of the Board, and a cross-application for enforcement by the Board, as to which this Court has jurisdiction pursuant to section 10 of the National Labor Relations Act (the "NLRA" or the "Act"), 29 U.S.C. § 160. The Board's Order is final with respect to all parties.

# II.
## ISSUES PRESENTED

1.    Whether the Board erred by deciding that the Company had a duty to bargain with the Union over implementation of the Non-Compete and Confidentiality Agreement ("NCCA") even though the Board described the NCCA as containing work rules, and the parties' collective bargaining agreement ("CBA") covered a broad array of management rights, including the Company's unilateral ability to implement work rules, policies and practices.

2.    Whether the Board erred by deciding that the NCCA is a mandatory subject of bargaining and that the Company violated sections 8(a)(5) and (1) of the Act by unilaterally implementing the NCCA.

3.    Whether the Board erred to the extent that it ordered the Company to bargain over implementation of any non-competition agreement in the future.

4.    Whether the Board erred by deciding that the provisions of the NCCA titled "Interference with Relationships" and "At-will Employment" violated section 8(a)(1) of the Act.

### III.
### RELEVANT STATUTES AND REGULATIONS

**Section 7 of the NLRA, 29 U.S.C. § 157:**

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

**Section 8 of the NLRA, 29 U.S.C. § 158(a):**

It shall be an unfair labor practice for an employer – …

(1)  to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;…

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

(d) [Obligation to bargain collectively] For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party . . .

**Section 10 of the NLRA, 29 U.S.C. § 160:**

**(f) Review of final order of Board on petition to court**

2

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

## IV.
## STATEMENT OF THE CASE AND FACTS

The facts relevant to this appeal are largely undisputed and set forth below.

(JA248).

### A.    A Core Aspect of the Company's Business Is the Development of Confidential and Proprietary Information.

MTI is a resource and technology-based company that develops, produces, and markets a range of specialty mineral, mineral-based and synthetic mineral products and supporting systems and services. (JA325, 333, 334).  Minteq and SMI are wholly-owned subsidiaries of MTI (collectively, these entities are referred to as the "Company"). (JA235).   The Company invests significant resources into researching, developing and introducing new products, equipment and processes.

3

(JA325-327).   Thus, the Company develops and maintains confidential and proprietary information, including the materials used in the refracting segment, the process for applying those materials and the equipment used to apply those materials.  (JA339; JA247).  This has allowed the Company to create and maintain new market opportunities, but it also poses a substantial risk to the business if the Company's confidential and proprietary information is misappropriated.  (JA325, 339).  As the Company's 10-K states:

> The Company's ability to compete is based in part upon proprietary knowledge, both patented and unpatented.  The Company's ability to achieve anticipated results depends in part on its ability to defend its intellectual property against inappropriate disclosure as well as against infringement.

(JA339).

Minteq, the employer at issue in this case, operates in the refractories segment of the Company's business, which means that it sells application of its proprietary refractory materials to the walls of furnaces used in the steel-making process among other things.  (JA327-328, 333, 334; JA235, 247).  ArcelorMittal's ("ACM's") Burns Harbor steel mill, located in Gary, Indiana is one of Minteq's customers.  (Tr. 41:2-3 (JA253), 46:5-19 (JA256), 52:19-53:4 (JA260-261), 65:22-66:7 (JA267-268); JA480 and 500; JA246-247).  Minteq employees, known as SMS Gunners, use special equipment and processes to apply Minteq's products to

the lining of Basic Oxygen Furnaces ("BOFs").  (Tr. 65:22-66:7 (JA267-268), 66:21-67:6 (JA268-269), 105:4-15 (JA293); JA237; *see also* JA327-328).

Union Business Agent Michael Simms ("Simms") admitted that Minteq makes "a significant investment" in training SMS Gunners to develop the skills necessary to perform their work.  (Tr. 67:8-21 (JA269)).  It takes at least two months of on-the-job training for an SMS Gunner to develop the skills necessary to operate the equipment and apply the refractory product used to service the BOFs.  (Tr. 66:4-16 (JA268); 116:4-7 (JA301)).  SMS Gunners are also given access to data sheets listing the ingredients that make up the refractory compound and the procedures they must follow in applying it.  (Tr. 139:12-24 (JA315)).  Finally, because of their close daily interactions with Minteq's customers' managers, supervisors, and employees, SMS Gunners play a key role in developing and maintaining strong customer relationships. (Tr. 67:8-21 (JA269)).  In other words, SMS Gunners possess Minteq's confidential and proprietary information.

Minteq has battled fierce competition (including efforts to poach its employees) in order to retain ACM's business. (Tr. 63:25-64:17 (JA265-266), JA279-283).  In 2009, ACM replaced Minteq with a competitor called Nucon.  (Tr. 76:18-77:4 (JA277-278); 97:21-98:2 (JA290-291)).  Some SMS Gunners resigned their employment with Minteq to work for Nucon.  (Tr. 95:9-17 (JA288); 99:6-8

(JA292)).  Minteq eventually won back ACM's work.  (Tr. 53:5-11 (JA261); 77:4-9 (JA278); 98:25-99:8 (JA291-292)).

## B.     The Company Took Reasonable Steps to Protect its Confidential and Proprietary Information.

Given the Company's substantial investment in its confidential and proprietary information, the training of its employees, and the competitive environment in which it operates, it is critical for the Company to secure and protect its proprietary and confidential information.  (JA339).  Accordingly, beginning in 2012, Minteq made a significant change in its hiring practices by including the NCCA in the packet of documents successful applicants for SMS Gunner positions had to sign in order to be hired.  (Tr. 93:20-94:3 (JA286-287); 151:19-152:5 (JA319-320); JA492, 519-1207, 1313; JA235).  The plain language of the NCCA states that "the Company desires to employ Employee . . . ."  (JA492, 1313) (emphasis added).  This requirement did not apply to anyone hired prior to 2012.  (See JA235, 247; see also JA981, 1011).

NCCA section 1.1 states:

> Employee agrees and acknowledges that in order to assure the Company that it will retain its value as a going concern, it is necessary that Employee undertake not to utilize Employee's special knowledge of the Business (as defined below) and Employee's relationships with customers and suppliers to compete with the Company.  Employee further acknowledges that:
>
> (a)     the Company is and will be engaged in the business of developing, producing and marketing performance-enhancing

> minerals, mineral-based and synthetic mineral products for the paper, polymer, healthcare and other manufacturing industries on a worldwide basis (the "Business");
>
>      (b)     the agreements and covenants contained in this Section 1 are essential to protect the Company and the goodwill of the Business; and
>
>      (c)     Employee's employment with the Company has special, unique and extraordinary value to the Company and the Company would be irreparably damaged if Employee were to provide services to any person or entity in violation of the provisions of this Agreement.

(JA494 § 1.1).  The NCCA  goes on to prohibit its signatories from (i) engaging in Competitive Activities during their employment and for a period of 18 months following their employment (the "Restricted Period"); (ii) soliciting Minteq's customers or suppliers during the Restricted Period; and (iii) soliciting or encouraging any present or future customer or supplier to terminate or otherwise alter its relationship with the Company in an adverse manner.  (JA494-496 §§ 1.2, 1.3, 4).  These sections, when read together prohibit signatories from engaging in the covered activities "directly or indirectly, as employee, agent, consultant, stockholder, director, partner or in any other individual or representative capacity" on behalf of other entities.  Thus, the central purpose of the NCCA is to protect the Company against the irreparable harm that could occur if an employee was to use his or her knowledge of Minteq's confidential and proprietary information and/or relationships with customers and suppliers to compete with Minteq.  (JA1313).

7

Minteq required successful applicants to sign the NCCA and other documents before they began their orientation.[2]   Thus, Charles Spear, whose departure from Minteq to work for a competitor triggered this case, signed the NCCA and other paperwork as soon as he arrived to Minteq's Portage, Indiana office on March 21, 2013, before he started his on-line orientation.  (Tr. 112:6-10 (JA297),   122:5-9 (JA303), 127:1-5 (JA305); JA1256, 1289-1296, 1299-1301). Other employees signed their NCCA prior to arriving at the office for orientation. (*See* JA519 (signed 7/16, began orientation on 7/31); JA593 (signed 6/26, began orientation 7/09); JA1165 (signed on 4/22, began orientation on 4/23, signed on 4/22)).[3]   Although Spear and SMS Gunner Michael Otto were paid for their time on the first day of orientation, they testified that the NCCA was to be signed before anything else, and that failure to sign the paperwork meant that they would not get the SMS Gunner job.  (Tr. 125:2-12 (JA304),   140:4-7 (JA316),   146:17-21 (JA318)).

---

[2] The other paperwork that successful applicants were required to complete included a Form I-9, an employee information form, an affirmative action form, a direct deposit agreement and authorization, a Form W-4, an acknowledgement of company policies, a company credit card agreement and a new employee orientation checklist.  (JA1313).

[3] One employee signed the NCCA the day after he began orientation.  (JA1207).

C.    **Minteq's Burns Harbor Employees Are Covered by a Collective Bargaining Agreement.**

During relevant times, Minteq's SMS Gunners at Burns Harbor were represented by the Union and covered by successive CBAs.  (JA480, 500; JA235).  One such agreement was in effect from January 1, 2011 through December 31, 2014 (the "2011 CBA") and thus covered the 2012 time period when Minteq implemented the NCCA.  (JA500).  This CBA contains a broad management rights clause stating in relevant part:

> Except as expressly modified or restricted by a specific provision of this Agreement, all statutory and inherent managerial rights, prerogatives, and functions are retained and vested exclusively in the Company, including but not limited to, the rights:...to control and regulate the use of machinery, facilities, equipment, and other property of the Company; to introduce new or improved research, production, service, distribution, and maintenance methods, materials, machinery, and equipment; to issue, amend and revise work rules and Standards of Conduct, discipline steps, policies and practices; and to take whatever action is either necessary or advisable to manage and fulfill the mission of the Company and to direct the Company's employees.

(JA501-502).[4]  The 2011 CBA also states:

---

[4] The management rights clause also gives Minteq "the right to make or change and after proper publication thereof, to enforce any reasonable plant rule.  The question or reasonable [sic] of any new plant rule and/or modification to an existing rule may be challenged by the Union under the grievance and arbitration procedure."  (JA502).  The Union did not challenge the NCCA through the grievance procedure.  The CBA also contained a "zipper clause" stating, "During negotiations resulting in this Agreement, the Company and the Union each had unlimited right and opportunity to make demands and proposals with respect to

> An employee who has never accrued seniority under this
> Agreement or an employee rehired shall be in "probationary"
> status until completion of six (6) months of employment….
> There shall be no seniority among probationary employees.
> The discipline, layoff or discharge of an employee who is in
> probationary status shall not be a violation of this Agreement.

(JA502).  Once they complete orientation, employees reported to the mills to begin

their on-the-job training.  (Tr. 115:11-116:7 (JA300-301),122:5-9 (JA303), 139:25-

140:7 (JA315-316), 145-46 (JA317-318)).  They were then covered by the CBA,

which stated in Article I that it applies to SMS Gummers engaged in the

application of refractory materials and to all refractory work performed in certain

areas of the mills.  (JA501).  Per the CBA, Minteq can discharge or discipline these

employees without just cause or recourse to the grievance and arbitration process

during their six-month probationary period.

### D.    Magnesita's 2014 Push Into Burns Harbor.

In September 2014,[5] Simms learned that ACM was going to contract with

Minteq's competitor, Magnesita, to service one of the BOFs Minteq was servicing.

---

any subject matter as to which the National Labor Relations Act imposes an
obligation to bargain." (JA511).

[5] The parties engaged in negotiations for a successor CBA in November or
December of 2014, and reached an agreement that became effective on January 1,
2015, which continued in effect the same management rights and probationary
provisions as the 2011 CBA.  (Tr. 45:19-46:1 (JA255-256); 69:5-70:5 (JA270-
271); 70:14-20 (JA271); 92:16-22 (JA285); JA480).  During these negotiations, the
Union made a conscious decision not to request negotiations over Minteq's use of
NCCAs as part of its hiring process. (Tr. 70:6-23 (JA271); 71:22-72:3 (JA272-
273); 72:18-24 (JA273)).

(Tr. 58:18-25 (JA262), 60:8-15 (JA263)).  Simms was aware that some bargaining unit employees could lose their jobs as a result of this development.  (Tr. 60:22-61:9 (JA263-264)).  Unbeknownst to Minteq, Simms had an exploratory meeting with Magnesita to discuss its hiring plans, whether the Union could refer employees to Magnesita, and whether Magnesita would recognize the Union.  (Tr. 61:10-62:2 (JA264-265)).

Spear also learned that "Magnesita was coming in to try and take Minteq's work" and about Magnesita's hiring plans during a discussion with fellow SMS Gunners Nick Carrillo and Dennis Sharp.  (Tr. 129:6-130:12 (JA306-307); 131:8-14 (JA308)).  In mid-September, Spear, Dennis Sharp, Dustin Sharp, and Carrillo interviewed with and accepted offers from Magnesita to work on the BOF as SMS Gunners.  (Tr. 131:15-132:2 (JA308-309); JA474-478).  About a week later, Spear notified Minteq that he was resigning his employment to become an SMS Gunner for Magnesita.  (Tr. 131:22-132:10 (JA308-309)).  Around this same time, Simms met with several Minteq SMS Gunners (including Spear and the Sharps) to discuss their going to work for and organizing Magnesita.  (Tr. 63:20-64:19 (JA265-266); 135:2-22 (JA311)). Those who attended the meeting signed union authorization cards for the organizing campaign Simms was pursuing with Magnesita.  (Tr. 65:5-14 (JA267)).

11

**E.**    **Minteq's Response to Magnesita's Poaching of its Employees**

On October 17, 2014, after Spear's employment relationship with Minteq had ended, Minteq's Vice President, Global Refractories Brett Argirakis sent nearly identical letters to Spear, the Sharps, and Carrillo (with copies to Magnesita) informing them of their obligation not to disclose or use Minteq's "proprietary or confidential information."  (Tr. 132:25-133:3 (JA309-310); JA474-478; JA1305). The NCCA was referenced in and attached to Spear's letter because he was the only one of the four employees hired after 2012.[6]  (Tr. 93:20-94:3 (JA286-287); 151:19-152:5 (JA319-320);JA492, 519-1207, 1313).

On October 23, 2014, Argirakis sent another letter to Spear (with a copy to Magnesita) regarding the NCCA Spear signed, identifying Magnesita as a competitor, advising Spear of his obligation not to work for a competitor and requesting compliance with the NCCA.  (Tr. 108:8-15 (JA296)).  (JA492).  Spear took this letter to mean that "I could not share any trade secrets in my new job" and needed to abide by the non-compete.  (Tr. 132:13-19 (JA309); 133:4-7 (JA310)).

On or about October 24, 2014, Spear met with Simms at the Union's office and provided Simms with a copy of the letter he received from Argirakis.  (Tr.

---

[6] Minteq also sent Spear a letter on or about September 29, 2014 reminding him that the law and the NCCA prohibited him from disclosing or using Minteq's confidential information after he left Minteq's employment.   (JA492).

44:5-19 (JA254)).  On October 30, 2014, the Union filed the initial unfair labor practice charge in this matter.  (Tr. 137:17-19 (JA313); JA321).

Spear remained employed with Magnesita until early 2015 when Magnesita lost ACM's business at Burns Harbor and Spear was laid off.  (Tr. 136:17-138:10 (JA312-314)).   There is no evidence that Minteq ever threatened or took disciplinary action against a current employee for violating the NCCA.

**F.    Proceedings Below.**

After initially dismissing the Union's charge on the grounds that it was time-barred and the NCCA requirement applied to applicants, not employees (JA470), the NLRB's Regional Director reversed course, issued a complaint on July 31, 2015, and issued an amended complaint on October 9, 2015.  (SJA3 & 10).  A hearing was held before Administrative Law Judge ("ALJ" or "Judge") Arthur Amchan on October 25, 2015, and Judge Amchan issued his decision on December 23, 2015.  (JA235, 246).  Both Minteq and Counsel for the General Counsel filed exceptions to the ALJ's decision and briefs in support of and opposition to those exceptions with the Board, and the Board issued its decision on July 29, 2016.  The Board reversed the ALJ's findings in substantial part and found violations that the ALJ did not, namely that the Company unlawfully failed to bargain over its implementation of the NCCA and violated section 8(a)(1) of the Act by including the "Interference with Relationships" and "At-Will Employee" provisions in the

NCCA.  (JA237-241).[7]    The Board ordered Minteq to cease and desist from utilizing the NCCA, rescind the complete NCCA and bargain with the Union before implementing any changes in wages, hours, or other terms and conditions of employment.  (JA242).  The Board limited its order to the Company's operations in Gary, Indiana.[8]  (JA235, 242).  The Company's petition for review was timely filed on August 8, 2016.

**V.**
**SUMMARY OF THE ARGUMENT**

**A.**    **Minteq's Implementation of the NCCA Was Covered By the Parties' CBA.**

This case is yet another example of the NLRB refusing to acquiesce in this Court's contract coverage approach to bargaining issues where the parties have negotiated a CBA.  Implementation of the NCCA, which the NLRB described as work rules, is covered by the 2011 CBA's management rights clause that allowed Minteq to issue, amend and revise work rules, policies and practices.  The NLRB attempted an end-run around the Court's contract coverage standard by stating that even under that standard the NCCA would not be covered because the management rights clause does not specifically mention the NCCA or any of its

---

[7] The Board also reversed the ALJ and held that the confidentiality and remedy provisions of the NCCA did not violate the Act.  (JA240).

[8] The Board's order in this regard is vague.  Given the evidence, Minteq assumes the Board's order is limited to the ACM facility in Gary, Indiana where Minteq performs work for ACM.

provisions.  This position is nothing more than the NLRB's clear and unmistakable waiver standard, however, and should be rejected.  Accordingly, the NLRB's order that the Company unlawfully failed to bargain over the NCCA and that the NCCA must be rescinded as a result should be denied enforcement.

## B.    <u>The NCCA Was Not a Mandatory Subject of Bargaining In Any Event.</u>

Moreover, even if Minteq's unilateral implementation of the NCCA was not covered by the parties' CBA, it was not a mandatory subject of bargaining. Therefore, Minteq had no duty to bargain over it.  The Board's conclusion to the contrary is not reasonably defensible for three reasons.  First, like the code of conduct rules at issue in *Newspaper Guild of Greater Philadelphia, Local 10 v. NLRB*, 636 F.2d 550 (D.C. Cir. 1980), the NCCA lies at the core of Minteq's entrepreneurial control and is therefore excluded from the realm of mandatory bargaining subjects.

Second, the NCCA does not sufficiently impact employees' terms and conditions of employment to qualify as a mandatory bargaining subject.  Not only does the substantial evidence show that execution of the NCCA was a hiring practice rather than an employment requirement, but also it shows that the NCCA is concerned with prohibiting conduct that is not protected by the Act, namely employees' efforts to use Minteq's confidential information to compete against it while still employed.  Further, the NCCA regulates matters outside the workplace

15

and outside the employment relationship, namely employees' relationships with Minteq's competitors.  On the other hand, the NCCA does not govern common topics over which employers and unions are required to bargain such as wages, benefits, seniority, layoff procedures and the like.

Third, the reasons relied on by the Board to find the NCCA to be a mandatory bargaining subject are not supported by substantial evidence.  Instead, the Board speculates that employees could have been disciplined for violating the NCCA while they were employed, but the NCCA's expressly provided remedy is a lawsuit, not discipline, and the only evidence of attempted enforcement is against a former employee.  Similarly, the Board speculates that employees might suffer economic opportunity costs by being required to disclose inventions developed during their employment to Minteq, but there is no evidence of such costs.

Taken to its logical conclusion, the Board's holding in this case means that the Company will be required to negotiate with the Union over whether and how to protect its confidential information and whether and how to prevent its employees from breaching their duties of loyalty to Minteq.  And if the parties are unable to reach agreement on these issues, the Union is free to go on strike.  Apparently, the Board believes that the default position should be that employees can freely use such information in their own interests unless and until their Union agrees otherwise.  Such a position is not reasonably defensible given the critical nature of

16

Minteq's confidential and proprietary information to its business.  The Board's order that the NCCA is a mandatory subject of bargaining should therefore be denied enforcement.

### C.    The Board's Order Should Be Denied Enforcement to the Extent It Requires the Company to Bargain Over Rules that Comply with the Board's *Peerless Publications* Decision.

Further, in *Peerless Publications*, 283 NLRB 334, 335 (1987), the Board held that a presumptive bargaining obligation may be overcome if the topic at issue goes to the protection of the core purpose of the enterprise, is narrowly tailored to that purpose and is appropriately limited to necessary employees.  Here, to the extent that the Board's order requires the Company to bargain over a non-compete agreement that meets these requirements, it should be denied enforcement.

### D.    The Board Erred in Finding that the NCCA's Interference with Relationships and At-Will Provisions Violated Section 8(a)(1).

Finally, the Board erred in finding that the NCCA's Interference with Relationships and At-Will Employment provisions violated section 8(a)(1) of the Act.  The Board took both provisions out of context, imported every conceivable negative implication into them and found them to be overly broad on that basis.  It therefore failed to comply with its decision in *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004), (hereafter "*Lutheran Heritage*") which requires the Board to read these provisions objectively to determine whether an employee would reasonably interpret them to interfere with protected activities.  In doing so, the

17

Board may not presume improper interference, must read the challenged provisions in context and may not find a violation simply because the language could "conceivably be read to cover Section 7 activity." *Id.* Because the Board failed to comply with these requirements, its decision that these provisions violated section 8(a)(1) should be denied enforcement.

## VI.
## STANDING

The Company has standing to seek review in this Court as an aggrieved party to a final order of the Board pursuant to 29 U.S.C. § 160(f). *See Retail Clerks Local 1059 v. NLRB*, 348 F. 2d 369, 370 (D.C. Cir. 1965).

## VII.
## ARGUMENT

The NLRB's decision that Minteq violated sections 8(a)(5) and (1) of the Act should be denied enforcement for the following reasons.

### A.    The NLRB Erred in Finding that the Company Violated Section 8(a)(5) Because Implementation of the NCCA Was Covered By the CBA.

Contrary to the NLRB's holding, Minteq had no duty to bargain over the implementation of the NCCA because the implementation was covered by the 2011 CBA. This Court has held repeatedly that a union "may exercise its right to bargain about a particular subject by negotiating for a provision in a collective bargaining contract that fixes the parties' rights and forecloses further mandatory bargaining as to that subject." *NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 836 (D.C.

18

Cir. 1993) (quoting *Local Union No. 47, IBEW v. NLRB*, 927 F.2d 635, 640 (D.C. Cir. 1991)) (other internal citations and quotation marks omitted); *accord Enloe Med. Ctr. v. NLRB*, 433 F.3d 834, 838 (D.C. Cir. 2005); *BP Amoco Corp. v. NLRB*, 217 F.3d 869, 872-73 (D.C. Cir. 2000). "To the extent that a bargain resolves any issue, it removes that issue *pro tanto* from the range of bargaining." *NLRB v. Postal Serv.*, 8 F.3d at 836 (internal quotation marks and citations omitted). In other words, the question is whether the bargaining topic is already covered by the collective bargaining agreement. *Id.* Once an employer and a union bargain about and memorialize a topic in their collective bargaining agreement, a set of rules is created that govern their future relations, and there is no continuous duty to bargain about them. *Id.*

Furthermore, courts are bound to enforce collective bargaining agreements as written. *Id.* This Court owes no deference to the NLRB's interpretation of a collective bargaining agreement. *Id.* at 837; *accord Enloe*, 433 F.3d at 837-38. Rather, the Court should review the CBA *de novo* to determine whether Minteq's implementation of the NCCA was covered by it. *BP Amoco*, 217 F.3d at 873; *Postal Serv.*, 8 F.3d at 837.

The Court does not require that the NCCA or its provisions be specifically mentioned in the CBA in order for Minteq to have the right to implement them. All that is required is that Minteq's decision be "within the compass" of the rights

19

granted to it under the CBA. *NLRB v. Postal Service*, 8 F.3d at 837-38 ("[A]

collective bargaining agreement establishes principles to govern a myriad of fact

patterns," and the reductions at issue were "within the compass of" rights granted

in the management rights clause); *Department of the Navy v. FLRA*, 962 F.2d 48,

58-59 (D.C. Cir. 1992) (rejecting an agency's "covered by" test requiring that the

contract "specifically addresses the particular subject matter at issue").[9]   The

contract coverage standard is a lower burden than the Board's "clear and

unmistakable waiver" standard. *See Enloe*, 433 F.3d at 837 ("The Board's doctrine

imposes an artificially high burden on an employer who claims its authority to

engage in an activity is granted by [a collective bargaining agreement].").

## 1.    The Management Rights Clause Covered Minteq's Implementation of the NCCA.

The 2011 CBA contained a broad management rights clause that covered

Minteq's implementation of the NCCA.

### a.    The NLRB Described the NCCA As a Work Rule, Policy or Practice.

Throughout this case, Counsel for the General Counsel and the NLRB have

consistently stated that the NCCA constitutes work rules. Section V(a) of the First

Amended Complaint alleged, "At all material times during the past six months,

---

[9] *See also BP Amoco*, 217 F.3d at 873-74 (reservation of rights clauses in benefit
plans incorporated into contract even though not specifically mentioned in contract
where benefit plans generally were made a part of the contract).

Respondent, by its Non-Compete and Confidentiality Agreement, . . . has maintained the following rules . . . ." (SJA4 at V(a)). Counsel for the General Counsel also described the NCCA as a "work rule" and stated that the NCCA "subjects employees to discipline" in her briefing to the NLRB. (JA112-113, 228).

Most importantly, the NLRB determined that the NCCA was a mandatory subject of bargaining because it "includes rules governing employees' conduct" and that "employee work rules are mandatory subjects of bargaining." (JA237).[10] Although the NLRB stated that some of the NCCA's provisions "extend beyond work rules," it also stated that implicit in the NCCA is a threat of discipline or discharge for failing to comply with its terms. (JA237 & n. 9). The NLRB is bound to its conclusion in this regard and should not be allowed to regard the NCCA as work rules only when it is convenient for its argument to do so. *See NLRB v. Metropolitan Life Ins. Co.*, 380 U.S. 438, 443-444 (1965) ("[T]he integrity of the administration process requires that courts may not accept appellate counsel's post hoc rationalizations for agency action) (internal quotation marks and citations omitted); *Albertson's, Inc. v. NLRB*, 301 F.3d 441, 453 (6th Cir. 2002) ("[T]his Court will not affirm the Board's actions based on reasons not relied upon by the Board itself.").

---

[10] In the alternative, for the reasons discussed *infra* at 26, the Board's holding that the NCCA is a mandatory subject of bargaining, including its conclusion that employees would be disciplined for violating it during their employment, is not supported by substantial evidence.

The NLRB's description of the NCCA as work rules means that the 2011 CBA's management rights clause giving Minteq the right to issue, amend and revise work rules, policies and practices, covers Minteq's implementation of the NCCA. (JA501-502). Simms, in his capacity as the representative responsible for bargaining and administering the CBA on behalf of the Union, even admitted that the CBA allowed Minteq to implement the NCCA. (Tr. 72:15-76:21 (JA273-277)). In short, the NLRB's and the Union's own words make clear that the NCCA consists of work rules and Minteq's implementation of it was covered by the management rights clause. *See NLRB v. Postal Serv.*, 8 F.3d at 837; *Chicago Tribune Co. v. NLRB*, 974 F.2d 933, 936-37 (7th Cir. 1992) (no duty to bargain over decision to implement drug test because management rights clause reserved right "to establish and enforce reasonable rules and regulations relating to the operation of its facilities and to employee conduct.").

> **b.    Other Provisions of the Management Rights Clause Support Minteq's Implementation of the NCCA.**

Other provisions of the management rights clause reinforce the conclusion that the CBA covered Minteq's right to implement the NCCA without bargaining. A primary purpose of the NCCA is to protect the Company's research, production, service, distribution, and maintenance methods, materials, machinery and equipment—the very things that the CBA's management rights clause gives

Minteq the right to introduce to the bargaining unit.[11]  (JA494 § 1; JA501-502).

Moreover, the clause allows Minteq "to control and regulate the use of machinery, facilities, equipment and <u>other property</u> of the Company."  (JA501-502) (emphasis added).  Goodwill, confidential information, and inventions developed by employees in the course of performing Minteq's business constitute Minteq's property.  *See, e.g., Carpenter v. United States*, 484 U.S. 19, 26 (1987) ("Confidential business information has long been recognized as property"); *Northern Elec. Co., Inc. v. Torma*, 819 N.E.2d 417, 429 (Ind. Ct. App. 2004) (data compiled by employee on company's behalf during course of employment constituted employer's property); *Unger v. FFW Corp*., 771 N.E.2d 1240, 1244 (Ind. Ct. App. 2002) (goodwill of a business includes secret or confidential information, and such information is a property right that an employer is entitled to protect).[12]

Finally, the management rights clause allows Minteq to take "whatever

---

[11] Indeed, the NCCA defines the Company's "Business" as being "engaged in the business of developing, producing and marketing performance-enhancing minerals, mineral-based and synthetic mineral products for the paper, polymer, healthcare and other manufacturing industries on a worldwide basis."  (JA494 § 1).

[12] The NCCA specifies that it will be governed by New York law.  (JA498 § 15). New York courts have reached the same conclusion.  *Empower Energies, Inc. v. Solarblue, LLC*, 16cv3220(DLC), 2016 U.S. Dist. LEXIS 130583 (S.D.N.Y. Sept. 23, 2016) citing *Carpenter v. United States,* 484 U.S. 19, 26 (1987)("confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect . . .").

action is either necessary or advisable to manage and fulfill the mission of the Company and to direct the Company's employees."[13]   A primary mission of Minteq is developing proprietary products and methods, and these are the very things the NCCA is designed to protect.  Because Minteq's right to implement the NCCA is covered by the CBA, the Board's order requiring the Company to rescind it should be denied enforcement.

### 2.   The Board Applied the Incorrect "Clear and Unmistakable Waiver" Standard in Finding a Bargaining Violation.

Continuing its long-running disagreement with the Court regarding the contract coverage approach, the Board expressly rejected this standard and held that the Union did not clearly and unmistakably waive its right to bargain over the NCCA.  (JA238 n.14).   *See Enloe*, 433 F.3d at 835 (noting the long-running dispute between the NLRB and this Court over the covered-by standard). Remarkably, the Board rejected application of the contract coverage standard even though it recognized that the Seventh Circuit, where the facts of this case arose, and this Circuit, which has venue over all appeals from Board proceedings, both

---

[13]   The zipper clause reinforces the foregoing because both parties agreed that they had the unlimited right and opportunity to bargain over any matter as to which the Act requires bargaining, and the parties clearly negotiated over Minteq's ability to implement rules, policies and procedures, to take steps to regulate its property and to take other actions necessary or advisable to fulfill the mission of the Company. (JA511).  Thus, the parties recognized the very thing this Court has stated, namely that CBAs cannot specifically address every circumstance that might arise during their relationship.  *See NLRB v. Postal Serv.*, 8 F.3d at 838.

24

apply this standard. (JA238 n. 14). *See, e.g.*, *Enloe*, 433 F.3d at 835; *NLRB v. Postal Serv.*, 8 F.3d at 836; *Chicago Tribune Co. v. NLRB*, 974 F.2d at 936-37. This is the very type of conduct for which this Court recently castigated the Board and awarded attorney's fees against it in *Heartland Plymouth Court MI, LLC v. NLRB*, --F.3d--, 2016 U.S. App. LEXIS 17688, at *1416 (D.C. Cir. 2016) (noting that the NLRB can readily ascertain which circuit's law will apply given its historic policy of seeking enforcement of its orders in the circuit in which the unfair labor practices arose and stating, "It is difficult to see the Board's steadfast refusal to seek *certiorari* on the "contract coverage" question as something other than an evasion of finality in the name of hegemony.").

Recognizing its dilemma, the Board attempted an end run around the precise contours of the contract coverage standard by stating in dicta that even if it applied the doctrine here, Minteq's argument would fail. (JA238 n.14). The Board reached this conclusion because "the language of the management rights clause, considered in light of the complete absence of relevant bargaining history, cannot fairly be read to cover the NCCA and the specific, significant, restrictions it unilaterally imposes on employees." (*Id.*). The Court need not defer to this conclusion because it reviews the Board's contract interpretations *de novo*. *NLRB v. Postal Serv.*, 8 F.3d at 837.

Further, this conclusory statement is nothing more than a recitation of the

25

Board's waiver analysis. *See Dept. of the Navy*, 962 F.2d at 58 (rejecting conclusion that bargaining topic was not "covered by" an agreement because the agreement did not specifically address the particular subject matter at issue). (internal quotation marks omitted).  As stated above, the contract coverage approach does not require that the NCCA or any of its provisions be specifically mentioned in the management rights clause in order for Minteq to have the right to implement it. *See Chicago Tribune Co*., 974 F.2d at 935, 937 (company lawfully implemented drug testing regulation where it had general management right to implement and enforce reasonable rules and regulations relating to the operation of its facilities and employee conduct).  Rather, all that is required is that Minteq's decision be covered by the parties' CBA.  And this decision was covered by the 2011 CBA's management rights clause conferring on Minteq the right to implement and change rules, control its property and take other actions necessary or advisable to fulfill the mission of the Company. *See NLRB v. Postal Service*, 8 F.3d at 837-38; *Department of the Navy*, 962 F.2d at 58-59.

Indeed, if the CBA specifically had to identify each rule that Minteq had the right to implement, its negotiated right to implement rules would be nullified. *See Dept. of the Navy*, 962 F.2d at 59.  Such a legal requirement also would be contrary to one of the underpinning principles of the contract coverage approach, namely that parties cannot anticipate every eventuality that may arise during the term of

26

their contract.  *See NLRB v. Postal Serv.*, 8 F.3d at 838.  For all of the foregoing

reasons, the Board's order that Minteq violated section 8(a)(5) of the Act by

unilaterally implementing the NCCA should be denied enforcement.

**B.** **Even if The NCCA Was Not Covered by the CBA, It Is Not a Mandatory Subject of Bargaining.**

Even if implementation of the NCCA was not covered by the 2011 CBA,

Minteq still had no duty to bargain over it because it was not a mandatory subject

of bargaining.[14] *See Pall Corp. v. NLRB*, 275 F.3d 116, 119 (D.C. Cir. 2002)

(citing *Allied Chem. & Alkali Workers of Am. Local Union No. 1 v. Pittsburgh*

*Plate Glass Co*, 404 U.S. 151, 178 (1971) and stating that the Act does not prohibit

unilateral change of terms concerning permissive subjects).  The Board's holding

to the contrary appears to be the first time that the Board has substantively

discussed the issue of whether non-competes are mandatory subjects of bargaining,

and its decision that the NCCA is a mandatory bargaining subject is not reasonably

defensible and is not supported by substantial evidence.  *See Brewers and*

---

[14] "In *National Assoc. of Gov't Employees, Local 500*, 327 NLRB 676 (1999), the Board adopted without discussion an ALJ determination that unilateral implementation of an employment agreement covering numerous terms and conditions of employment and containing a non-compete clause violated section 8(a)(5).  In response to the employer's argument that the non-compete was part of the status quo that existed prior to employees voting for union representation, the ALJ noted in a footnote that the non-compete clause was a mandatory subject of bargaining, particularly because it purported to require employees to pay damages to their employer.  *Id*. at 684, n. 8.  Neither the ALJ nor the Board addressed the arguments being raised in this case.

*Maltsters, Local Union No. 6 v. NLRB*, 414 F.3d 36, 42 (D.C. Cir. 2005) (the Board's decisions regarding mandatory bargaining subjects will be upheld if reasonably defensible and its findings of fact will be upheld if supported by substantial evidence); *Pall Corp. v. NLRB*, 275 F.3d 116, 121 (D.C. Cir. 2002) (stating that the Court must determine whether the Board's approach to mandatory bargaining subjects "is a reasonably defensible reading of the statute" that is consistent with the Supreme Court's decisions).

Section 8(d) of the Act requires employers and unions to bargain over "wages, hours and other terms and conditions of employment." 29 U.S.C. § 158(d). Although the Board is entitled to deference in determining whether a topic is a mandatory subject of bargaining, section 8(d) does not "immutably fix a list of subjects for mandatory bargaining;" rather, it "establish[es] a limitation against which proposed topics must be measured." *Pittsburgh Plate Glass Co.*, 404 U.S. at 178 (1971). Generally, this "limitation includes only issues that settle an aspect of the relationship between the employer and employees." *Id.*; *Ford Motor Co. v. NLRB*, 441 U.S. 488, 495 (1979). Mandatory subjects of bargaining do not include items that seek "to govern employee activities which might occur *outside* the workplace and *outside* the employment relationship." *See Mental Health Servs., N.W.*, 300 NLRB 926, 927 (1990) (proposal to prohibit employees from interfering with the ability of the company to provide services by attempting

28

to restrain, coerce or influence the company's funding sources was a permissive subject of bargaining).

The Board's holding that the NCCA is a mandatory subject of bargaining is not reasonably defensible because (1) the decision to implement the NCCA lies at the core of entrepreneurial control; (2) the NCCA does not sufficiently impact terms and conditions of employment; and (3) it is not supported by substantial evidence.

### 1.    The NCCA Is Excluded from Mandatory Bargaining Because It Lies at the Core of Entrepreneurial Control.

Minteq's confidential and proprietary information is key to its business success and therefore the NCCA, which protects that information, lies at the core of Minteq's entrepreneurial control.  As the Company stated in its 10-K, "The Company's ability to compete is dependent upon its ability to defend its intellectual property against disclosure and infringement."  (JA516).  In an apparent case of first impression, the Board held that the NCCA did not lie at the core of Minteq's entrepreneurial control, however, because it was "not a management decision that [had] only an indirect and attenuated impact of the employment relationship or that involved a change in the scope and direction of the enterprise."  (JA238, internal quotation marks and citations omitted).  This reading of Supreme Court precedent is far too narrow.  *Oklahoma Gas & Elec. Co. v. FERC*, 827 F.3d 75, 78 (D.C. Cir. 2016) (citing *New York New York, LLC v.*

29

*NLRB*, 313 F.3d 585, 590 (D.C. Cir. 2001) and stating, "We are not obligated to defer to an agency's interpretation of Supreme Court precedent . . .").  Moreover, it completely ignores this Court's decision in *Newspaper Guild of Greater Philadelphia, Local 10 v. NLRB*, 636 F.2d 550 (D.C. Cir. 1980).

> **a.     The Supreme Court Excludes Matters Lying at the Core of Entrepreneurial Control from Mandatory Bargaining.**

The Supreme Court has made clear that matters lying at the core of a company's entrepreneurial control are not mandatory bargaining subjects.  First, in *Fibreboard Paper Prods. Corp. v. NLRB*, Justice Stewart stated in his concurrence that section 8(d) defines a limited category of issues subject to mandatory bargaining.  379 U.S. 203, 220 (1964).  He then focused on management decisions impacting job security and stated that not every decision that impacts job security falls into this category.  379 U.S. at 223.  He concluded:

> If, as I think clear, the purpose of § 8(d) is to describe a limited area subject to the duty of collective bargaining, those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area.

*Id*.

The Supreme Court picked up this thread in *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 676 (1981), and stated, "[I]n establishing what issues must be submitted to bargaining, Congress had no expectation that the elected union representative would become an equal partner in the running of the

business . . . ." The Supreme Court then noted that "the concept of mandatory bargaining is premised on the belief that collective discussions backed by the parties' economic weapons will result" in better decisions, but only if the subject is "amenable to resolution through the bargaining process." *Id*. at 678. The Court went on to state, "Management must be free from the constraints of the bargaining process to the extent essential for the running of a profitable business." *Id*. at 678-79. The Court concluded:

> [I]n view of an employer's need for unencumbered decision making, bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective bargaining process, outweighs the burden placed on the conduct of the business.

*Id*. at 679. In short, Justice Stewart's *Fibreboard* concurrence and *First National Maintenance* make clear that not every decision impacting employees' terms and conditions of employment is a mandatory bargaining subject.

### b.    This Court Has Applied *Fibreboard* to Unilateral Implementation of Rules.

Neither *Fibreboard* nor *First National Maintenance* addressed the implementation of employer rules without bargaining. But this Court addressed whether the unilateral implementation of rules could lie at the core of entrepreneurial control in *Newspaper Guild of Greater Philadelphia, Local 10 v. NLRB*, 636 F.2d 550, 559-60, (D.C. Cir. 1980). Just as the Supreme Court in *First*

31

*National Maintenance* relied heavily on Justice Stewart's concurrence in *Fibreboard*, the *Newspaper Guild Court* stated that Justice Stewart's concurrence correctly interpreted the law. *Id*. at 560. The Court then held that "protection of the editorial integrity of a newspaper lies at the core of publishing control" because "that characteristic is to a newspaper or magazine what machinery is to a manufacturer." *Id*. The Court concluded:

> In order to preserve these qualities, a news publication must be free to establish without interference, reasonable rules designed to prevent its employees from engaging in activities which may directly compromise their standing as responsible journalists and that of the publication for which they work as a medium of integrity.

*Id*. Although the Court noted that the employer's control in this regard must be narrowly tailored to protect the core purposes of the enterprise, it held that not all aspects of the employer's implemented rules were mandatory subjects of bargaining.

### c. Minteq's Confidential and Proprietary Information Lies at the Core of Entrepreneurial Control and Minteq Should Not Be Ordered to Bargain About Protecting Such Assets.

Just like the employer's code of ethics rules directly addressed a matter at the core of a publisher's entrepreneurial control, the NCCA directly addresses a matter at the core of Minteq's entrepreneurial control, namely Minteq's ability to protect its confidential and proprietary information. As the testimony, the Company's 10-K and the NCCA itself make clear, Minteq operates in a highly

32

competitive environment in which its work and its employees at ACM were taken away from it in whole or in part on at least two occasions. Thus, Minteq changed its hiring practice to require execution of the NCCA to protect its confidential and proprietary information since loss of those assets presents a significant risk to the business. (JA516). The NCCA is specifically tailored to this purpose—it does not address any topic other than steps to protect Minteq's confidential and proprietary information and inventions. Simply because the NCCA did not have the effect of shutting down a part of Minteq's business or constitute a direct investment of capital in new equipment or processes does not mean it is any less critical to Minteq's survival as a profitable business. 452 U.S. 678-79. Similar to what the *Newspaper Guild* court stated, protection of Minteq's confidential and proprietary information is to Minteq what machinery is to a manufacturer. *Id*.

> **d.    The NCCA Is Not Amenable To Bargaining Because That Would Require Minteq to Bargain Over Whether Employees Will Be Allowed to Engage In Unprotected Anticompetitive Conduct.**

Through its holding in this case, the Board has effectively ordered the Company to bargain over whether to allow its employees to compete with it and whether to allow employees disclose the Company's confidential and proprietary information to its competitors—conduct that the Board has declared is unprotected in other circumstances. *See, e.g., Abell Eng'g & Mfg*., 338 NLRB 434, 434-35 (2002) (employee's solicitation of co-worker to go to work for competitor was

33

unprotected activity); *Crystal Linen & Uniform Serv., Inc*., 274 NLRB 946, 948 (1985) (employees soliciting former customers to switch allegiance from Crystal to another company was unprotected activity); *Kenai Helicopters*, 235 NLRB 931, 936 (1978) (employees properly discharged where they were going to use a strike to divert business to a competitor); *Associated Advertising Specialists, Inc*., 232 NLRB 50, 54 (1977) (employee in layoff status properly discharged where he attempted to divert customer away from his employer).   Further, if the parties cannot come to an agreement, then the Company faces a strike.   *See Newspaper Guild*, 636 F.2d at 561, n.35.   Taken to its logical conclusion, the Board's position effectively is that employees are free to engage in unfair competition with their employers unless their unions agree that they should not do so.   Such a position destroys a company's ability to protect and control its confidential information and is not reasonably defensible.[15]

---

[15] The Board's positions on whether a non-compete agreement is a mandatory or permissive subject of bargaining are inconsistent.   Thus, when an employer has made similar proposals during negotiations and insisted on them to the point of impasse, the Board and its Division of Advice have determined that they are permissive subjects of bargaining on which employers cannot insist to impasse. *See Mental Health Servs*., 300 NLRB at 927 (proposal to prohibit employees from interfering with outside funding sources permissive subject of bargaining); *Polar Water Co.*, Case No. 06-CA-23917, 1992 NLRB GCM LEXIS 81 (January 24, 1992) ("Employer violated Section 8(a)(5) by insisting to impasse on the inclusion of the non-compete in the collective-bargaining agreement").   Here, however, when Minteq unilaterally implemented the NCCA, the Board held it was a mandatory subject of bargaining.   The Board has therefore placed employers in an impossible position: non-competition proposals are permissive subjects when an

Balanced against the critical business risks addressed by the NCCA, the benefit of requiring bargaining over the NCCA is limited.  As discussed below, the NCCA has a limited impact on current employees' terms and conditions of employment while shielding Minteq from anticompetitive behavior that neither the Board nor courts have condoned.

## 2.     The NCCA Does Not Sufficiently Impact Terms and Conditions of Employment.

Additionally, the NCCA does not sufficiently impact terms and conditions of employment to be considered a mandatory subject of bargaining.

### a.     The NCCA Is a Hiring Practice.

First, contrary to the Board's conclusion that the NCCA was a condition of employment, the evidence establishes that signing the NCCA was a hiring practice that applied to applicants, not employees, and thus falls outside the scope of mandatory bargaining.  *See Hertz Corp. v. NLRB*, 105 F.3d 868, 873 (3rd Cir. 1997) (noting that hiring practices do not directly apply to employees and only become mandatory subjects of bargaining if the union has an objective basis to believe the practice is discriminatory); *United States Postal Service*, 308 NLRB

---

employer proposes them during bargaining and mandatory subjects when an employer implements them without bargaining.  *See, e.g., I.R.S. v. Fed. Lab. Rel. Auth.*, 963 F.2d 429, 440-441 (D.C. Cir. 1992) (agency commits legal error where its analysis is illogical and internally inconsistent).  The result is that unions rather than companies have control over how to protect companies' intellectual property because their agreement is required before a company can take steps to protect it.

35

1305, 1308 (1992) (citing *Star Tribune*, 295 NLRB 543 (1989) and holding that "hiring practices generally fall into a class of business decisions affecting individuals outside the bargaining unit over which an employer is not obligated to bargain with the Union.").[16]   The NCCA itself recites that the person signing it "desires" employment rather than already being an employee.  (JA494).   Only new hires beginning in 2012 were required to sign the NCCA, and almost all of them signed it before they began their orientation.  In fact, three individuals signed the NCCA in the days and weeks before they arrived at Minteq's office to begin orientation.  In light of this record evidence, the fact that Minteq paid eight hours per day for orientation activities simply is not substantial evidence that the NCCA was an employment requirement as opposed to a hiring practice over which there was no duty to bargain.

### b.    The NCCA Does Not Sufficiently Impact Terms and Conditions of Employment Because it Regulates Unprotected Conduct.

Further, the NCCA does not sufficiently impact terms and conditions of employment to be a mandatory subject of bargaining because it regulates

---

[16] In one of the few cases to address non-competition agreements under the Act, *Polar Water Co.*, Case No. 6-CA-24823, 1992 NLRB GCM LEXIS 65 (November 6, 1992), the NLRB's Division of Advice recommended dismissal of a charge alleging the employer violated Section 8(a)(5) when it imposed a requirement that applicants for bargaining unit positions sign a Covenant Not to Compete as part of the hiring process.  Relying on *Star Tribune*, the Division of Advice found that the requirement was not a mandatory subject of bargaining because applicants are not "employees" for section 8(a)(5) purposes.

unprotected conduct occurring outside of work during an employee's employment. As stated above, the Board has found that employees who violate their duties of loyalty while employed are not protected by the Act. *See Abell Eng'g*, 338 NLRB at 434-35 (employee's solicitation of co-worker to go to work for competitor was unprotected activity); *Crystal Linen*, 274 NLRB at 948 (employees soliciting former customers to switch allegiance from Crystal to another company was unprotected activity); *Kenai Helicopters*, 235 NLRB at 936 (employees properly discharged where they were going to use a strike to divert business to a competitor); *Associated Advertising Specialists*, 232 NLRB at 54 (employee in layoff status properly discharged where he attempted to divert customer away from his employer).[17]

In other words, even if the NCCA did not exist, employers have the legal right to expect employees to comply with these common law duties during their

_____

[17] *See also NLRB v. Knuth Bros, Inc*., 537 F.2d 950, 956 (7th Cir. 1976) (disclosing confidential information to customers is disloyal); *Ashville School*, 347 NLRB 877, n.2 (2006) ("disclosure of confidential wage and salary information was not protected"); *Frontier Tel. of Rochester*, 344 NLRB 1270, 1277-79 (2005) (denying reinstatement to employee who forwarded proprietary and confidential information from the employer's database to his home computer); *Altoona Hosp*., 270 NLRB 1179, 1180 (1984) ("An employee's violation of an employer's rule against the disclosure of confidential information may also be the subject of lawful discipline even when the disclosure is made for reasons arguably protected by the Act."); *Aerotek Inc.,* Case Nos. 17-CA-071193, *et. al.*, 2013 NLRB LEXIS 151, 30-33 (Mar. 11, 2013) citing cases and finding (employee's attempt to compete with employer violates duty of loyalty and loses Act's protection).

employment.[18]  And that is also a primary focus of the NCCA.  Violations of the NCCA during employment would include (i) competing with Minteq; (ii) soliciting Minteq's employees, customers or suppliers to leave Minteq; and (iii) improperly disclosing Minteq's confidential information.  Thus, the Board's order requiring Minteq to bargain over the NCCA in effect requires Minteq to bargain with a union over whether its employees should be allowed to engage in unprotected conduct that threatens the integrity of Minteq's confidential and proprietary information. This is simply not reasonably defensible given how important Minteq's confidential and proprietary information is to its business, and it fails to take account of the business realities in which Minteq (and many other employers) operate.  *See, e.g., Adtranz ABB Daimler-Benz Tranp., N.A. v. NLRB*, 253 F.3d 19, 27 (D.C. Cir. 2001) (noting the NLRB's remarkable indifference to employer

---

[18] The Board's decisions in this regard are comparable to the state law duty of loyalty that employees owe employers. *See e.g., Amtrack v. Veolia Transp. Servs.*, 791 F. Supp. 2d 33, 49 (D.C. Cir. 2011) (fiduciary duty of loyalty breached when employee participates in the bid of an employer's rival); *Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 283 (S.D.N.Y. 2016) ("Under New York law, an employee owes the employer a duty of good faith and loyalty" which is breached if employee "makes improper use of employer's time, facilities, or proprietary secrets"); *Davis v. Eagle Products, Inc.*, 501 N.E.2d 1099, 1104 (Ind. Ct. App. 1986) (employee owes employer a fiduciary duty of loyalty; employees may not disclose confidential information or solicit co-workers in order to compete with employer); *Kopka, Landau, & Pinkus v. Hansen* 874 N.E. 2d 1065, 1070 (Ind. Ct. App. 2007) (citing *Potts v. Review Bd. Of the Ind. Emp. Sec. Div.*, 475 N.E. 2d 708, 712 (Ind. Ct. App 1985) and stating "prior to termination of his employment, an employee must refrain from actively and directly competing with his employer for customers and employees and must exert his best efforts on behalf of his employer").

38

concerns that prompt it to adopt certain rules).

Reinforcing the limited connection that the NCCA has to employees' terms and conditions of employment, the NCCA is also concerned with regulating non-work conduct between individuals and companies other than Minteq after the employee's employment with Minteq ends. *See Mental Health Services*, 300 NLRB at 927 & n.7 (proposal's prohibition against interfering with Company's outside funding sources was not a mandatory subject of bargaining because, among other things, it sought to "regulate nonwork activities not germane to the working environment."); *Harrah's Lake Tahoe Resort*, 307 NLRB 182 (1992) (Act does not protect conduct intended to advance employees' interests as "entrepreneurs, owners, and managers"). Significantly, the NCCA's restrictions specifically exclude conduct that the employee might take on behalf of Minteq. NCCA Section 1.2, for example, prohibits employees from engaging in certain relationships with third parties, but specifically excludes activities that the employee takes on behalf of Minteq. Similarly, NCCA section 1.3 prohibits employees from soliciting co-workers to go to work for another company, but specifically excludes such conduct on behalf of Minteq. In other words, these core provisions relate not to employees' relationship with Minteq, but to employees' relationship with Minteq's competitors.

Finally, the NCCA does not regulate many of the items that are traditionally encompassed within the phrase "wages, hours and other terms and conditions of employment." For example, it does not purport to set wages, benefits, seniority, overtime, vacations or holidays. It does not establish job grades or layoff procedures. It does not regulate uniforms or establish the price of food in the cafeteria. *See, e.g., Fibreboard*, 379 U.S. at 222 (Stewart, J. concurring) (stating, "What one's hours are to be, what amount of work is expected during those hours, what periods of relief are available, what safety practices are observed would all seem conditions of one's employment.").

At the end of the day, while an employee is employed, the NCCA simply requires that he or she is loyal to Minteq, refrains from using Minteq's confidential information to compete against it, and discloses inventions discovered during the course and scope of employment to Minteq—all things that Minteq lawfully could require without bargaining even if the NCCA did not exist. Accordingly, the NCCA does not have a material or significant effect on the terms and conditions of employment in the bargaining unit. *See Polar Water Co.*, No. 6-CA-23917, 1992 NLRB GCM LEXIS 81 (January 24, 1992) (contract proposal prohibiting unit employees who leave the employer from removing customers lists and competing

40

against the employer for two years was a permissive subject of bargaining);[19]

*Pieper Electric, Inc.,* 339 NLRB 1232, 1236 (2003) (holding that employee stock purchase plan not a mandatory subject of bargaining because it fell outside the scope of wages, hours, and other terms and conditions of employment).

### 3.    The Board's Holding that the NCCA Was a Mandatory Subject of Bargaining Is Not Supported by Substantial Evidence.

In light of the foregoing, the Board's additional reasons for finding the NCCA to be a mandatory bargaining subject, namely: (a) employees might be disciplined for violating the NCCA during their employment; and (b) the NCCA might impose economic opportunity costs on employees; are not supported by substantial evidence.  (JA237).  The Board simply assumed that the NCCA created the possibility of discipline for non-compliance and economic opportunity costs for compliance.  (JA237).  But nothing in the NCCA states that employees will be disciplined for violating it; rather, the NCCA clearly sets forth the remedy for a violation of its provisions—Minteq's ability to go to court, seek an injunction and seek damages.  (JA492).  Of course, an employer's ability to go to court to seek redress does not, standing on its own, constitute or threaten discipline or

---

[19] Although not binding precedent, the Court has relied upon a NLRB General Counsel Advice Memo to ascertain a legal proposition. *See Boise Cascade Corp. v. NLRB,* 860 F.2d 471, 475 (D.C. Cir. 1998)

employment loss.[20]

Moreover, the only evidence of attempted enforcement is through a letter to a former employee requesting compliance.  This is not evidence of possible enforcement against current employees, and it does not support such an inference, either.  (JA492).  When the NCCA is read in its entirety, this makes sense because a central concern of the NCCA is protecting Minteq's confidential information from acquisition by third parties after employees have left Minteq.  That is why the NCCA requires employees leaving Minteq's employment to sign an affidavit that they have disclosed inventions related to their work activities.  (JA496 § 3.2(b)).  That is also why the NCCA prohibits employees from working for or soliciting customers or clients on behalf of a Minteq competitor for a period of time following their employment.  (JA494-495 §§ 1.2, 1.3).  And that is why it prohibits employees from interfering with Minteq's customer and supplier relationships. (JA494 § 11).

Similarly, the Board speculates that employees could lose income by not being able to go to work for a competitor in the event Minteq reduced hours or engaged in a lockout.  Of course, there is no evidence that employees actually lost

---

[20]  Indeed, Minteq has a Constitutionally protected right to petition the courts for redress when it has reason to believe a current or former employee has misused or is misusing his or her position to sabotage its business or business relationships, and the Supreme Court has held that the NLRB is therefore prohibited from finding that such a suit is an unfair labor practice.  U.S. Const. Amend. I; *BE&K Constr. Co. v. NLRB*, 536 US 516, 536-537 (2002); *BE&K*, 351 NLRB 451, 457 (2007).

42

income during their employment as a result of signing the NCCA, however, and the Board's speculation as to what might happen if Minteq engages in certain conduct in the future is not substantial evidence. In fact, the Board has held that strikers' engaging in activities that compete against their employer during a strike was unprotected conduct for which the striker could be fired.[21] *See Crystal Linen*, 274 NLRB at 948-49.

The inferences the Board draws must be reasonable ones based on record evidence. *King Electric, Inc. v. NLRB*, 440 F. 3d 471, 475 (D.C. Cir. 2006) (when engaged in fact finding, Board must only draw inferences from what the evidence fairly demands); *Conrail v. Surface Transp. Bd.*, 93 F.3d 793, 799 (D.C. Cir. 1996) (reviewing court must "guard against an agency's drawing inferences that are arbitrary in relation to the facts found"). The evidence here is that the NCCA does not state that employees could be disciplined for violating it during their employment and Minteq took steps to enforce the NCCA against a *former*

---

[21] Moreover, the Board similarly assumes that the NCCA's Inventions provision prohibits employees from benefiting from their discoveries, inventions and knowledge acquired while working for Minteq because employees are required to disclose such things to Minteq. (JA237). But the Board's use of the phrase "related to working for the Respondent" in reaching this conclusion directly undermines the legal basis for the conclusion because employee inventions and work product developed while working for an employer on working time belong to the employer. *See, e.g., Northern Elec. Co.*, 819 N.E.2d at 429; *Unger v. FFW Corp.*, 771 N.E.2d at 1244. Apparently, the Board believes that employees should be able to sell inventions they make on behalf of their employers, during working time and with the employer's facilities and equipment to the highest bidder to enrich themselves at the expense of their employer.

43

employee.  There is simply no evidence (as opposed to speculation) supporting the Board's conclusion that employees would be disciplined for violating its terms or subject to economic opportunity costs for compliance during their employment. *See, e.g., Medeco Security Locks v. NLRB*, 142 F.3d 733, 742-743 (4th Cir. 1998) (speculation about an employer's motives is not substantial evidence); *Carry Cos. v. NLRB*, 30 F.3d 922, 928 (7th Cir. 1994) (stating that "sheer speculation" is not substantial evidence).  The Board's order that Minteq rescind the NCCA should be denied enforcement for this reason as well.

**C.** **Even If the Court Finds the NCCA Is a Mandatory Subject of Bargaining and Not Covered by the 2011 CBA, the Board's Order Is Overly Broad and Should Be Denied Enforcement.**

The Board found that the NCCA is a mandatory subject of bargaining, ordered Minteq to rescind it and ordered Minteq to give the Union notice and opportunity to bargain before changing terms and conditions of employment. (JA242). To the extent that this order requires Minteq to bargain before implementing any non-compete agreement it should be denied enforcement because it is not consistent with *Newspaper Guild* and *Peerless Publications, Inc.*, 283 NLRB 334 (1987).  In *Peerless Publications, Inc.*, 283 NLRB at 335, which was the Board's decision upon receiving the remand from the *Newspaper Guild* Court, the Board held that a presumptive bargaining obligation may be overcome by showing that the subject matter addressed by the challenged rule goes to the

44

"protection of the core purpose of the enterprise" and (1) is "narrowly tailored in terms of substance, to meet with particularity only the employer's legitimate and necessary objectives, without being overly broad, vague or ambiguous; and (2) appropriately limited in its applicability to affected employees to accomplish the necessarily limited objectives."  Although some of the challenged rules in *Peerless* were not narrowly tailored and therefore ordered rescinded, the Board made clear that its decision did not preclude the employer from unilaterally establishing new rules that satisfied the Board's test under *Peerless*.[22]

The NCCA satisfies the *Peerless* test because, as discussed above and below, the NCCA: (1) directly addresses a core entrepreneurial concern; and (2) is narrowly tailored to address only Minteq's legitimate interests in protecting its confidential and proprietary information from unauthorized disclosure to competitors.  Even if the Court finds Minteq was obligated to bargain about the NCCA in its current form and orders it rescinded, Minteq may still implement a new NCCA that meets the Board's test under *Peerless Publications*.  In this situation, Minteq would not have an obligation to provide notice and opportunity to

---

[22] In *King Soopers, Inc*., 340 NLRB 628, 629 (2003), two members of a three member panel opined that *Peerless Publications* was limited to its unique factual circumstances arising in the newspaper industry.  The Board has applied *Peerless Publications* to situations outside the newspaper industry, however, without indicating it is so limited, and the dissenting Board member disagreed with the panel majority in this regard.  *See id.* at 632; *GHR Energy Corp*., 294 NLRB 1011, 1012 (1989).

bargain such an NCCA.  To the extent that the Board's order requires otherwise, it should be denied enforcement.

**D.    The Board Erred in Finding that Certain Aspects of the NCCA Violate Section 8(a)(1).**

Finally, the Board erroneously concluded that two provisions of the NCCA, the "Interference with Relationships" provision and the "At-Will Employment" provision, violate section 8(a)(1).  In determining whether these provisions violate section 8(a)(1), the Board considers whether they "would reasonably tend to chill employees in the exercise of their statutory rights."  *Adtranz*, 253 F.3d at 25 (quoting *Lafayette Park Hotel*, 326 NLRB at 825 (1998)) (internal quotation marks omitted).  If the NLRB "faithfully applies this standard, and adequately explains the basis for its conclusions," the Court will enforce its order.  *Id*.  On the other hand, "where the NLRB adopts an unreasonable or otherwise indefensible interpretation of Section 8(a)(1)'s prohibition", the Court will deny enforcement. *Id*.

Under this approach, the first question is whether the rule explicitly restricts section 7 activity.  *See World Color (U.S.A.) Corp. v. NLRB*, 776 F.3d 17, 20 (D.C. Cir. 2015) (citing *Guardsmark, LLC v. NLRB*, 475 F.3d 369, 374 (2007)). If it does not, the rule will violate the NLRA only if: (1) employees would reasonably construe the language to prohibit section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of

46

section 7 rights.  *Id*.; *Lutheran Heritage*, 343 NLRB 646, 647 (2004).

There is no evidence or allegation that the NCCA provisions at issue were promulgated in response to union activity or that they were applied to restrict the exercise of section 7 rights; thus, the question is whether <u>employees</u> (as opposed to the Board) would <u>reasonably</u> construe the challenged provisions to prohibit their protected conduct.  In *Lutheran Heritage*, the Board set forth some common sense rules of construction to aid this determination.  First, the Board may not presume improper interference with employee rights.  *Id*. at 646.  Second, the challenged language in each section may not be read in isolation but must be viewed in the broader context of the entire provision.  *Id*.  Third, the challenged language must be given a reasonable reading; the Board may not find a violation simply because the language could "conceivably be read to cover Section 7 activity."  *Id*. at 647; *see also Charles Schwab Corp.*, Case No. 28-CA-084931, 2012 NLRB GCM LEXIS 34 (September 14, 2012) (agreement would not reasonably be construed by employees to restrict protected activity because the obvious purpose of the agreement when read as a whole was to protect the employer's intellectual and human capital).  Finally, language that is clarified and restricted in scope by examples of clearly illegal or unprotected activity is not unlawful.  *Tradesmen International*, 338 NLRB 460, 460-462 (2002) (prohibition against "disloyal, disruptive, competitive, or damaging conduct" would not be reasonably construed

to cover protected activity given the rule's focus on other clearly illegal or egregious activity and the absence of any application against protected activity). As set forth below, the Board's decision departed from these rules of construction, was unreasonable, and should be denied enforcement.

1.    **The "Interference with Relationships" Provision Does Not Violate Section 8(a)(1).**

Even though the ALJ and the Board both purported to give objective, reasonable readings to NCCA section 4, Interference with Relationships, they reached opposite conclusions.  (JA240-241, 249).  Given the disagreement, this Court should closely scrutinize this decision.  *See Aggregate Industries v. NLRB*, 824 F.3d 1095, 1100 (D.C. Cir. 2016) ("when the Board reverses an ALJ on factual matters, we examine the disagreement with a gimlet eye.").

The Interference with Relationship section states:

> During the Restricted Period . . . Employee shall not, directly or indirectly, as employee, agent, consultant, stockholder, director, partner or in any other individual or representative capacity intentionally solicit or encourage any present or future customer or supplier of the Company to terminate or otherwise alter his, her, or its relationship with the Company in an adverse manner.

(JA496 § 4).  Despite Spear's testimony that he understood the NCCA to protect Minteq's trade secrets (Tr. 132:13-19 (JA309); 133:4-7 (JA310)), the Board concluded that this section:

> clearly places restrictions on employees' ability to communicate with Respondent's customers and restricts employee efforts to "improve

48

terms and conditions of employment or otherwise improve their lots as employees outside the immediate employee-employer relationship."

(JA241).  The Board went on to speculate that such efforts "could include asking customers to boycott the Respondent's products or services . . . [and] could also encompass other forms of appeals to the Respondent's customers."  (*Id*.)

As an initial matter, the Board's decision effectively holds that this provision prohibits protected conduct on its face.  Indeed, the Board did not even mention its "what employees would reasonably understand" standard in reaching this conclusion.  (*Id*.).  But nothing in this language mentions anything about employees' efforts to communicate with customers regarding their terms and conditions of employment or otherwise facially restricts their section 7 activities.  Furthermore, this provision is located in the middle of a document prohibiting anti-competitive conduct.  Thus, the Board found an express restriction on section 7 activities that simply does not exist.  *See World Color*, 776 F.3d at 20-21 (vacating Board holding that a hat rule facially prohibited employees from wearing hats with union insignia where, even though employees were required to wear a company hat, the company argued they could accessorize the hat in an appropriate manner, including with union insignia).

Moreover in reaching its conclusion, the Board also violated almost every canon of construction it laid out in *Lutheran Heritage* to aid in determining

whether an employee would *reasonably* construe a rule as construing his or her section 7 rights. This is so, again, because the Interference with Relationships provision is an integral part of a larger document that clearly is designed to protect Minteq's confidential and proprietary information, customer relationships and human capital from improper disclosure and interference. *See Aroostook County Reg. Ophthalmology Ctr. v. NLRB*, 81 F.3d 209, 212-13 (D.C. Cir. 1996) (rule prohibiting discussing of office business with relatives lawful where context demonstrated that it was designed to prevent employees from discussing patient medical information); *Tradesmen Intern.*, 338 NLRB at 462 ("Employees would not reasonably believe that an expectation that they represent the Company in a 'positive and ethical manner,' in the context of a prohibition on conflicts of interest, would prohibit Section 7 activity."); *Charles Schwab Corp.*, supra at 8. That is why the NCCA, including the Interference with Relationships provision, prohibits employees from engaging in anti-competitive conduct as an employee, stockholder, director, partner, etc. of another entity competing with Minteq. Indeed, NCCA section 1.1, Employee's Acknowledgement, states:

> In order to assure the Company that it will retain its value as a going concern, it is necessary that the Employee undertake not to utilize the Employee's special knowledge of the business (as defined below) and Employee's relationships with customers and suppliers that compete with the Company.

(JA494 § 1.1).  The NCCA goes on to explain that the "agreements and covenants contained in this Section 1 are essential to protect the Company and the goodwill of the Business", and that the signer's employment with Minteq has special, unique and extraordinary value to Minteq and that irreparable damage would result if the signer were to provide services to any person or entity in violation of the NCCA. (JA494 § 1).  All of this is contained in a stand-alone document.

Rather than reading the Interference with Relationships provision in this context and explaining why this context was insufficient to guide employees' reasonable interpretation, however, the Board simply ignored the rest of the NCCA, analyzed the Interference with Relationships provision in isolation and found that the language could conceivably be read as prohibiting section 7 conduct. The Board thus presumed improper interference with employee rights, and found a violation based on a conceivable rather than a reasonable reading of the provision. This is especially problematic considering that when read in its proper context the Interference with Relationships provision prohibits conduct that is not protected by the Act.  *See, e.g., Abell Eng'g*, 338 NLRB at 434-35; *Crystal Linen*, 274 NLRB at 948; *Kenai Helicopters*, 235 NLRB at 936; *Associated Advertising Specialists*, 232

NLRB at 54. Because the Board's reading of this rule is unreasonable and in violation of its decision in *Lutheran Heritage*, it should be denied enforcement.[23]

### 2.    The "At-Will Employment Rule" Does Not Violate Section 8(a)(1).

The Board also disagreed with the ALJ and unreasonably held that the NCCA's At-Will employee provision violated the Act. *See Aggregate Industries*, 824 F.3d at 1100. This provision states,

> Employee acknowledges that this Agreement does not affect Employee's status as an employee-at-will and that no additional right is provided herein which changes such status.

(JA498). Again, the Board failed to analyze this provision as a whole and in context.

---

[23] Minteq agrees with the general statement of law that the ability of employees to communicate with customers about terms and condition of employment for mutual aid and protection is a protected section 7 right. (JA241). However, when read in context, it is clear that employees would not reasonably interpret the Interference with Relationships provision of the NCCA as interfering with this right. None of the cases cited by the Board stand for the proposition that such a provision appearing in a non-competition agreement does in fact interfere with employees' section 7 rights. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 565-566 (1978) (employer's refusal to allow distribution of newsletter in non-work areas regarding virtues of the union and appeals to legislators regarding right to work and minimum wages issues violated section 8(a)(1)); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. Trades Council*, 485 U.S. 568, 578-579 (1988) (distribution of handbills urging public not to shop at stores in shopping mall due to a store owner's relationship with non-union contractor did not violate the Act); *Allied Aviation Serv. Co.*, 248 NLRB 229, 230-231 (1980) (letter sent by shop steward to customers complaining about on-going labor disputes was protected by the Act); *Richboro Cmty. Mental Health Council*, 242 NLRB 1267, 1268 (1979) (letter sent by employee to funding source of employer related to discharge of a co-worker protected).

First, this language states a fact – *i.e.*, the NCCA does not change the signer's at-will status.   As stated above, the NCCA is signed by successful applicants before they begin their orientation.  At that time, and for their six month probationary period, they are at-will employees under the CBA.  Specifically, CBA Article 4 states that, "The discipline, layoff or discharge of an employee who is in probationary status shall not be a violation of this Agreement," which means that a probationary employee can be fired for any reason and without recourse to the grievance-arbitration provisions of the 2011 CBA.  It is only *after* this six month period that the CBA (not the NCCA) modifies the at-will relationship.

Second, the Board reached its holding because "employees would reasonably doubt whether the CBA's just cause provision remains in effect," which, according to the Board could have a litany of ill effects on employees' willingness to exercise their protected rights.  (JA241).  Of course, the Board presents no evidence supporting this conclusion beyond its own speculation in its fictional role as a Minteq employee allegedly engaged in a reasonable reading of this provision.

More importantly, the Board completely ignores three facts that undermine its holding:  (1) as stated above, the NCCA was signed only by new hires whose employment was at-will until the CBA said otherwise; (2) Minteq and the Union negotiated a new collective bargaining agreement containing the very same

probationary and just cause language _after_ Minteq implemented the NCCA; and (3)

nothing in the NCCA purports to prohibit employees from changing their at-will

status, which is the traditional reason why the Board's Division of Advice had

found at-will provisions unlawful.    In fact, the employer and employees here

agreed to change their at-will status after six months of employment through their

CBA's probation provision.    _See Lionbridge Technologies_, Case No. 19-CA-

115285, 2014 NLRB GCM LEXIS 11 (March 31, 2014) (recognizing that "at-will"

disclaimers are common and serve the legitimate purpose of protecting employers

against claims that the employment document at issue limits the presumptive right

employers have to discharge employees at-will; no violation for simply describing

employee's current status).[24]    Finally, the At-Will provision does not expressly or

implicitly address employee conduct.    It does not threaten employees with

---

[24] _See also Rocha Transportation_, Case 32-CA-086799, 2012 NLRB GCM LEXIS 39 at 4 (October 31, 2012)(requirement that only the company president could enter in agreements modifying the employment relationship did not foreclose the ability of employees to collectively bargain over their at-will status); _Windsor Care Centers_, Cases 32-CA-087540, _et al._, 2013 NLRB GCM LEXIS 5 (February 4, 2013) (same); _Fresh & Easy Neighborhood Market_, Case 21-CA-085615, 2013 NLRB GCM LEXIS 7 at 4-15 (February 4, 2013)(finding handbook provision that stated that "Any . . . agreement that changes your at-will employment status must be explicit, in writing, and signed by both [an Employer] executive and you" would not reasonably be construed to prohibit future section 7 activity); _SWH Corporation d/b/a Mimi's Cafe_, Case 28-CA-084365, 2012 NLRB GCM LEXIS 20 at 3-4 (October 31, 2012)(finding handbook provision stating, "No representative of the Company has authority to enter into any agreement contrary to the . . . 'employment at will' relationship" would not reasonably be construed to prohibit section 7 activity).

discipline for engaging in activity to change their at-will status. It does not require employees to agree that their at-will status can never be changed. All it does is state that the NCCA, standing alone, does not change the employee's employment status. Thus, as with the Interference with Relationships provision, rather than giving the at-will provision a reasonable reading, the Board has taken it out of context, imputed every conceivable negative reading into the language and unreasonably rendered its decision on that basis. As such, the At-Will provision cannot reasonably be construed to chill the exercise of section 7 rights. In sum, because the Board failed to give the At-Will provision a reasonable reading in light of the context in which it exists, the Board's order with respect to it should be denied enforcement.

## VIII.
## CONCLUSION

For all of the foregoing reasons, the Company respectfully requests that the Court grant its Petition, deny the Board's Cross-Petition for Enforcement, and enter judgment denying enforcement of the Board's order in relevant part because the Board erred in its findings that (1) the Company violated sections 8(a)(5) and (1) of the Act by unilaterally implementing the NCCA; and (2) violated section 8(a)(1) of the Act by maintaining the Interference with Relationships and At-Will Employment provisions of the NCCA. The Company further requests that the Court grant all relief to which it is justly entitled.

Respectfully submitted:

*/s/ Jonathan O. Levine*
Jonathan O. Levine
Adam P. Tuzzo
Littler Mendelson, P.C.
111 East Kilbourn Avenue, Suite 1000
Milwaukee, WI 53202
Tel:  (414) 291-5536
Fax:  (414) 291-5526
jlevine@littler.com
atuzzo@littler.com

A. John Harper III
1301 McKinney St., Suite 1900
Houston, Texas 77010
Tel:  (713)652-4750
Fax:  (713)513-5978
ajharper@littler.com

Maurice Baskin
1150 17th St., N.W.
Washington, D.C. 20036
Tel:  (202)772-2526
Fax:  (202)3184048
mbaskin@littler.com

*Counsel for Petitioner*

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

■    This brief contains 13,863 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(i).

2.    This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

■    This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

*/s/ Jonathan O. Levine*
Jonathan O. Levine

57

## CERTIFICATE OF SERVICE

The undersigned certifies that today, February 13, 2017, a copy of the attached *Final Brief of Petitioner/Cross-Respondent* was electronically transmitted to the United States Court of Appeals for the District of Columbia Circuit using the Court's ECF filing system, and was served on all counsel via electronic notice pursuant to the Court's ECF filing system.

*/s/ Jonathan O. Levine*
Jonathan O. Levine